# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 4, 2010

## STATE OF TENNESSEE v. BRENT RICHARDSON

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-180      Roger A. Page, Judge**

**No. W2009-00778-CCA-R3-CD   -   Filed June 17, 2010**

Following a jury trial, the defendant, Brent Richardson, was convicted of first degree felony murder, second degree murder, carjacking, aggravated robbery, aggravated burglary, aggravated assault, and aggravated kidnapping. The trial court merged the second degree murder conviction with the felony murder conviction and sentenced the defendant to an effective term of life plus forty-four years in the Department of Correction. On appeal, the defendant argues that the trial court erred in allowing the State to amend two counts of the indictment after the jury had been sworn and that the evidence was insufficient to support his convictions. Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

George M. Googe, District Public Defender, and Paul E. Meyers, II, Assistant Public Defender (on appeal); Charles L.K. Bloeser, Monteagle, Tennessee (at trial), for the appellant, Brent Richardson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

### State's Proof

Kallie Gaither testified that on March 16, 2007, she drove her boyfriend, Steven Thomas, home to his apartment on West King Street in Jackson. As Thomas opened his door to get out of the car, Gaither saw the armed defendant who demanded Thomas' wallet and phone. The defendant also told Gaither to give him her purse and phone, and she complied. The defendant then demanded Gaither's car keys, which she gave to Thomas. The defendant ordered Thomas to get out of the car, and, as Thomas was doing so, he dropped the keys. The defendant told Thomas, "What do you think I'm going to do, shoot you or something?" The defendant then demanded that the victims accompany him upstairs to Thomas' apartment. Inside the apartment, the defendant looked around, asked if the victims had any more phones, and when they told him no, he laughed and said, "Y'all don't have shit." The defendant then told the victims to go to Thomas' bedroom and shoved his gun in Gaither's back, saying, "Bitch, move." The defendant pointed his gun at Thomas and told him to get inside the closet, after which Gaither heard a gunshot. The defendant then approached Gaither and kissed her while holding the gun to her side. The defendant told her to go into the bathroom, and she locked both bathroom doors. She heard Thomas counting to twenty, and when he reached twenty, he knocked on the bathroom door and told her it was all right to come out. When she opened the door, Thomas was holding his side and asked her to get help. Gaither began screaming and banging on neighbors' doors, and Thomas collapsed on the ground. A neighbor called 911, and an ambulance arrived shortly thereafter.

Gaither said that on March 18, 2007, she identified the defendant from a photographic lineup and that she knew it was him as soon as she saw his photograph. She also identified the defendant in the courtroom. She said that her car, a 2003 or 2004 silver Grand Prix, was later returned to her by the police. Gaither said that she was five feet, eight inches tall and acknowledged that she told the police that the robber was between five feet, nine inches and six feet tall and was wearing jeans and "a dark hoodie." She identified the jacket admitted into evidence as the one the robber wore that night.

On cross-examination, Gaither recalled giving a sketch artist a description of the robber shortly after the incident and identified the drawing the artist prepared. As to the hairstyle of the robber depicted in the sketch, Gaither said she was unsure of the name of the hairstyle but had referred to it as "cornrows or something" at the time the sketch was made. She described the hairstyle as "kind of like braids, but it was kind of in a bun, in a bunch of little buns. And they were kind of spikey."

Officer Robbie Dean Weems of the Jackson Police Department testified that he was dispatched to the apartment of the victim, Steven Thomas, on March 16, 2007, where he found Thomas bleeding from a gunshot wound and lying in a hallway outside the apartment. Inside the apartment, Officer Weems observed what appeared to be a bullet hole in a closet door, blood on the door frame, and a shell casing on the floor.

Officer J. Nelson Stanfill of the Jackson Police Department testified that he assisted Officer Karrie Hart at the location where Gaither's abandoned vehicle was found on the evening of March 16, 2007. Photographs were made of the car which was discovered at the far east end of Deaderick Street. Officer Stanfill acknowledged that he did not find anything linking the defendant to the car.

Sergeant Christopher Wiser of the Jackson Police Department testified that he responded to the location where Gaither's vehicle was found. He said that he collected into evidence a jacket matching the description of the suspect's jacket which he found in the backyard of 367 Lexington Street, "about a hundred yards" from where Gaither's vehicle was discovered.

Sergeant Mike Turner, a crime scene investigator and custodian of the evidence room at the Jackson Police Department, testified that he processed a silver 2003 Pontiac Grand Prix for fingerprints. He said he made a total of thirteen latent lift cards which were placed into the evidence vault. He identified police department evidence forms which reflected that the black and white jacket, the brass shell casing, swabs containing blood, and two buccal swabs for DNA testing were signed out to Sergeant Alberto Colon to be transported to the Tennessee Bureau of Investigation ("TBI") laboratory. Sergeant Turner also identified an evidence form referencing the bullet recovered from the deceased victim's back.

Dr. Staci Turner, an assistant medical examiner for Davidson County and other counties in Tennessee, testified that she performed the autopsy on Thomas' body and determined that the cause of his death was a gunshot wound to the torso. She said the bullet entered the victim's chest and passed through the diaphragm, liver, and adrenal gland before lodging in the muscle in his back. Dr. Turner said she recovered the bullet from the victim's back.

Alex Brodhag, a firearms examiner for the TBI, testified that he examined the .380 automatic cartridge case recovered in the case and compared it with the bullet recovered from Thomas' body. He said that the bullet was a .380 automatic and was the type he "would expect to find in this cartridge had it not been fired."

TBI Special Agent Forensic Scientist Bradley Everett testified that he analyzed the swabs containing blood taken from Thomas' apartment, the steering wheel cover from the 2003 Pontiac, and the jacket recovered in the case. His examination of the jacket revealed the presence of the defendant's DNA on the collar and neck area. He found a mixture of DNA on the sleeve of the jacket, but the majority of the DNA matched the defendant's profile. On cross-examination, Agent Everett acknowledged that he did not find the defendant's DNA on the swabs with blood taken from Thomas' apartment or on the steering

wheel of the Pontiac vehicle.

TBI Special Agent Forensic Scientist James Russell Davis, II, testified that he performed a gunshot residue analysis on the jacket recovered in the case which revealed the presence of gunshot primer residue, meaning that the jacket "was in the vicinity of a weapon when it fired." On cross-examination, he acknowledged that he did not know when the residue got on the jacket.

Lashonda Sheperd testified that she had lived at 363 Lexington Street in Jackson for twenty-two years. She recalled a night in March 2007 when she saw police cars behind her house and a car in a ditch. At about the same time, the defendant, whom she knew as "B-Tard," came to her front door and was taking down the "plats" in his hair. When the defendant was asked about the car in the ditch, he said that it was his and that he had just gotten out of it. Sheperd also heard the defendant say that he had "just robbed somebody's house."

Sergeant Alberto Colon of the Jackson Police Department testified that, in addition to transporting the evidence to the TBI crime lab, he showed photographic lineups to Kallie Gaither, from which she identified the defendant. Sergeant Colon acknowledged that there was no physical evidence linking the defendant to the crime scene at the deceased victim's apartment or to Gaither's car.

William L. Roane, a latent fingerprint examiner for the Jackson Police Department, testified that he examined the thirteen latent prints collected from Gaither's car, from which there were six identifiable prints. He said that some of the prints matched Gaither, but none of them matched the defendant.

**Defense Proof**

Patrice Richardson, the defendant's mother, testified that the defendant was living with her in March 2007 and was between five feet, five inches and five feet, six inches tall at that time. She said that the defendant had a jacket like the one entered into evidence and that although his jacket was purchased in January 2007, she did not see it around the house after the first of February. She acknowledged that on March 16, 2007, the defendant was a runaway and that she did not know where he was that day.

Alyson Fraizer, a private investigator hired by the defense, testified that she had researched hairstyles which were more common to African-Americans. She said that dreadlocks were different from braids in that dreadlocks have to be cut out and cannot be taken down. She said that a plat is similar to a braid and described a cornrow as "a braid that

-4-

attaches to [the] head." She acknowledged that a person unfamiliar with the hairstyle terminology could get the terms mixed up.

At the conclusion of the proof, the jury convicted the defendant of all seven counts as charged in the indictment except for Count 1, which charged the defendant with first degree premeditated murder. On that count, the jury convicted the defendant of the lesser-included offense of second degree murder, which the trial court merged with the felony murder conviction in Count 2. The trial court imposed sentences of life for the felony murder conviction, eleven years for the carjacking conviction (Count 3), eleven years for the aggravated robbery conviction (Count 4), six years for the aggravated burglary conviction (Count 5), five years for the aggravated assault conviction (Count 6), and eleven years for the aggravated kidnapping conviction (Count 7). Finding, among other things, the defendant to be a dangerous mentally abnormal person so declared by a competent psychiatrist who concluded as a result of an investigation prior to sentencing that the defendant's criminal conduct had been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences, see Tenn. Code Ann. § 40-35-115(b)(3), the trial court ordered all sentences to be served consecutively for a total effective sentence of life plus forty-four years.

Although the sentencing of the defendant was not raised as an issue on appeal, we will set out, in brief, the evidence at the sentencing hearing.

Diane Jaynes testified that she was a presentence writer for the Tennessee Board of Probation and Parole, and a copy of the report which she prepared for the defendant was made an exhibit to the hearing.

Dr. Louis Douglass King testified that he was a psychiatrist, licensed to practice medicine in Tennessee and board certified in psychiatry. Dr. King said that he was part of the team that dealt with the defendant while he was hospitalized in the Timber Springs Child and Adolescent Unit at Western Mental Health Institute. He said that the defendant, who was sixteen years old at the time, met the criteria for having a conduct disorder, which was "characterized by a pattern of behavior which indicates a disrespect for others, their feelings, disregard for rules." Dr. King described what his records reflected as to the defendant's behavior over the years:

> Looking at his history, dating back to perhaps age five, he's come to the attention of mental health professionals, school officials, legal officials.
>
> He's been treated with numerous medications for hyperactivity, for mood disorder. He's received numerous diagnoses other than conduct

disorder.

When he was at Timber Springs the first time – and this is by my reading of his chart and discussing his behavior with individuals who were there, the program director of nursing and so forth – off of medication – He was off of medication for his first admission. His behavior was extremely problematic. He required injections to prevent aggressive behavior.

According to the program director of nurses at one time he picked up a chair and threatened to hit staff.

The second time that he was at Timber Springs he was on medication. Even though he demonstrated behaviors consistent with conduct disorder or antisocial personality in terms of disrespect, in terms of rule violation, he did not engage in the dangerous behavior that he exhibited on the first admission.

So my opinion about that is that there is something else that he has independent of immature frontal lobes that magnify the probability that given conduct disorder, antisocial personality, that he can act out in a dangerous fashion.

Dr. King said that there was "no known treatment for antisocial personality disorder."

Heather Shaffer testified that she was the mother of the victim, Kallie Gaither, and told of the severe and continuing effects of the crimes upon her daughter. Pamela Thomas testified that she was the mother of the victim, Steven Thomas, and told of the effects of his death upon her family and said that the defendant had not shown any remorse.

The first defense witness was Patrice Richardson, the defendant's mother. She said she believed that "he was first diagnosed with a mental disorder classified ED in the seventh grade, and then followed up shortly thereafter with bipolar disorder at Lakeside." She said that the defendant had been on a number of medications over the years.

George May testified that he was the defendant's homebound teacher, meaning that he taught students who could not attend regular school. As to education, May said the defendant "was excited. He was always talking about furthering his education, going to college."

Dr. Lynne Zager testified that she was a psychologist and, for twenty-six years, had been director of forensic services at Midtown Mental Health Center in Memphis. She said

that she had obtained the defendant's mental health records and, on four occasions in 2008, evaluated him at the Madison County Jail. She said that the diagnosis of the defendant through the Department of Corrections was that he had a bipolar illness and an impulse control disorder. She said it was possible that, while the defendant might age out of his impulse control disorder, he would have a bipolar disorder for the rest of his life.

## ANALYSIS

### I. Amendment of Indictment

The defendant argues that the trial court erred in allowing the State to amend Counts 6 and 7 of the indictment, which contained the incorrect date of the offenses, after jeopardy had attached. The State counters that the amendment was "unnecessary" and that any error committed by the trial court was harmless because the date was not an essential and material element of the offenses charged in those two counts.

We note that the first five counts of the indictment set out March 16, 2007, as being the date of the various offenses committed against the two victims by the defendant. Count 3 charged that the defendant took the automobile of the victim, Kallie Gaither, by use of a deadly weapon on that date; and Count 4 alleged that he took her purse and its contents that same day, also by use of a deadly weapon. However, Count 6 alleged that on or about November 13, 2007, by use of a deadly weapon, the defendant caused Kallie Gaither to reasonably fear imminent bodily injury; and Count 7 alleged that on or about October 31, 2007, the defendant did "unlawfully and knowingly remove and/or confine [her] as to interfere substantially with her liberty" while he was in possession of a deadly weapon. The argument presented by the defendant, after the State had asked to amend Counts 6 and 7 of the indictment, was that the grand jury had indicted him for the offenses occurring on the dates alleged in those two counts. The defendant did not allege that he was prejudiced by the amendments.

Finding that the mistakes were typographical errors and that the defendant would not be prejudiced by the amendment, the trial court allowed the State to amend the indictment to reflect the correct date of the offenses in Counts 6 and 7.

Tennessee Rule of Criminal Procedure 7(b) provides:

> (b) Amending Indictments, Presentments and Informations.
>
> (1) With Defendant's Consent. With the defendant's consent, the court may amend an indictment, presentment, or information.

(2) Without Defendant's Consent.   Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced.

In State v. Brown, 795 S.W.2d 689, 695 (Tenn. Crim. App. 1990), this court allowed amendment of an indictment to correct a typographical omission:

Amending an indictment to correct a typographical omission which was an unnecessary amendment is an exception to the rule that amendments are not allowed over the objection of a defendant once jeopardy has attached. State v. Lane, 673 S.W.2d 874 (Tenn. Crim. App. 1983).

The proof at trial clearly established that all of the offenses occurred on March 16, 2007, and there is no showing that the defendant was either surprised or prejudiced by these amendments.   Accordingly, we conclude that the trial court did not err in allowing amendment of the indictment.

## II.  Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence.  Specifically, he argues that the State did not meet its burden of proving his identity beyond a reasonable doubt and that there was no physical evidence linking him to the crimes.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We conclude that the evidence was more than sufficient to establish the defendant's identity as the perpetrator of the crimes. The surviving victim, Kallie Gaither, identified the defendant from a photographic lineup two days after the crimes and again in the courtroom at trial. A victim's identification of a defendant as the perpetrator of an offense is, alone, sufficient to establish identity. See State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

Furthermore, the defendant's DNA and gunshot primer residue were found on the jacket the police recovered in an area "about a hundred yards" from the location of Gaither's abandoned vehicle. Gaither also identified the jacket at trial as the one the defendant wore the night of the incident. Lashonda Sheperd testified that the defendant appeared at her house on the same night she saw a car in a ditch and police cars behind her house. She said that the defendant was taking down the "plats" in his hair and that when he was questioned about the car in the ditch, the defendant said it belonged to him. She also heard the defendant say that he had "just robbed somebody's house." We conclude that, based upon this evidence, a reasonable jury could have determined that the defendant was guilty of each of the offenses for which he was convicted.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE